Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WILLIAM LESTER, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>YIREN DIGITAL LTD., NING TANG, and KA CHUN WILLIAM HUI,<br><br>Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff William Lester ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by

defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Yiren Digital Ltd. ("Yiren" or the "Company"), analysts' reports and advisories about the Company, and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired publicly traded Yiren securities between April 29, 2026 and October 13, 2026, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. [1]

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

[1] Unless otherwise stated, all emphasis is added and internal citations are omitted.

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) and (c). Yiren is a Cayman Islands corporation with its principal executive offices located in Beijing, China, and is not a resident of the United States. The Individual Defendants (defined below) reside in China. Accordingly, Defendants may be sued in any judicial district pursuant to 28 U.S.C. §1391(c).

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6. Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7. Defendant Yiren describes itself as a "leading fintech company specializing in digital consumer lending, insurance, and financial technology innovation across China and global markets." Further, Yiren claims the following:

> The Company leverages advanced artificial intelligence and emerging technologies to enhance customer experience, optimize capital efficiency, and expand financial inclusion. Following the regulatory filing of its in-house developed Large Language Model Zhiyu, and the significant enhancement of its MagiCube Agent platform, Yiren Digital is establishing a new growth engine to accelerate its evolution into an AI-native, multi-industry operating platform extending beyond traditional financial services.

8. The Company is incorporated under the laws of the Cayman Islands, and its principal executive offices are located at 28/F, China Merchants Bureau Building, 118 Jianguo Road, Chaoyang District, Beijing 100022, the People's Republic of China. The Company's American Depositary Shares ("ADSs"), each representing two ordinary shares, trade on The New York Stock Exchange (the "NYSE") under the ticker symbol "YRD."

9. Defendant Ning Tang ("Tang") founded the Company and has served as its Executive Chairman since its inception and as its Chief Executive Officer ("CEO") since July 2019. Tang is also the founder of the Company's parent company and controlling shareholder, CreditEase Holdings (Cayman) Limited ("CreditEase"), and has served as CreditEase's chairman and CEO since its inception in 2006. Following a

restructuring of CreditEase on June 5, 2026, Tang beneficially owns approximately 82.0% of the Company's outstanding ordinary shares.

10. Defendant Ka Chun William Hui ("Hui") has served as the Company's Chief Financial Officer ("CFO") since July 2025. Prior to his appointment as CFO, he had held a role at CreditEase since 2017.

11. Defendants Tang and Hui are sometimes referred to herein as the "Individual Defendants."

12. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

13. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

15. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

16. CreditEase is a Cayman Islands company and the Company's parent and controlling shareholder. Tang founded CreditEase in 2006, and the Company describes CreditEase as "a large financial services company focusing on providing inclusive finance and wealth solutions in China." Tang is the sole director of CreditEase and, as the Company has admitted, "controls the decision-making of CreditEase."

17. The Company was incorporated in 2014 as a wholly owned subsidiary of CreditEase and completed a carve-out from CreditEase in the first quarter of 2015. The

Company nonetheless remains dependent on CreditEase. In its annual report for fiscal year 2025, the Company stated:

> ***We rely on our parent company, CreditEase, for the successful operation of our business.*** We have limited experience operating as a stand-alone company. Although we have become a stand-alone company, we expect CreditEase to continue to provide us with certain support services going forward.

18. As of March 31, 2026, CreditEase held 82.0% of the Company's outstanding ordinary shares and total voting power. As a result, the Company is a "controlled company" under the NYSE Listed Company Manual and relies on exemptions from certain corporate governance requirements, including the requirement that a majority of its board of directors be independent.

19. CreditEase and its affiliates provide the Company with system support, credit assessment, collection, and customer acquisition and referral services. In 2025, the Company paid CreditEase and its affiliates RMB450.9 million for these services.

20. The Company's disclosed related parties include CreditEase Pucheng Credit Assessment and Management (Beijing) Co., Ltd. ("Pucheng Credit"), Puxin, Heritvest Wealth Management (Hong Kong) Co., Limited ("Heritvest"), and Ruicheng Family Information Consulting (Beijing) Co., Ltd. ("Ruicheng"), each of which is

affiliated with CreditEase. Heritvest and Ruicheng provided customer acquisition and referral services to the Company.

21. The Company has also extended substantial loans to CreditEase affiliates. As of December 31, 2025, related parties owed the Company RMB2.97 billion, including RMB1.67 billion owed by Pucheng Credit and RMB1.09 billion owed by Puxin, amounts which related to, among other things, loans provided to those entities. In 2024, the Company loaned RMB1.0 billion to Puxin and RMB100 million to Pucheng Credit. During 2025, Pucheng Credit repaid just RMB85.5 million, and Puxin repaid nothing.

22. The Company conducts a portion of its operations in China through a variable interest entity ("VIE"), Yiren Financial Information Service (Beijing) Co., Ltd. ("Yiren Financial Information"). The equity interests of Yiren Financial Information are held by Tang, Pucheng Credit, and a third individual.

**Materially False and Misleading Statements Issued During the Class Period**

23. On April 29, 2026, Yiren filed its annual report on Form 20-F with the SEC for the fiscal year ended December 31, 2025 (the "2025 20-F"). The 2025 20-F was signed by Defendant Tang and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Defendants Tang and Hui attesting to the accuracy of the 2025 20-F.

24. In a section discussing the Company's concentration of credit risk, the 2025 20-F assured investors that the Company faced no significant credit risk on the amounts owed to it by CreditEase and its affiliates, stating:

> Financial instrument that potentially exposes the Group to significant concentration of credit risk primarily includes cash and cash equivalents, restricted cash, accounts receivable, contract assets, prepaid expenses and other assets, financing receivables, loans at fair value, and amounts due from related parties. . . . The risk with respect to accounts receivable, contract assets and loans to third parties is mitigated by credit evaluations the Group performs on its customers or third parties and its ongoing monitoring process of outstanding balances. ***The Group believes that there is no significant credit risk associated with amounts due from related parties***.

25. The statement in ¶ 24 was materially false and/or misleading at the time it was made because the related-party balances were owed principally by CreditEase affiliates controlled by Defendant Tang, were being rolled over rather than repaid, and had grown to RMB3.43 billion before the 2025 20-F was filed.

26. The 2025 20-F purported to warn of risks related to CreditEase but confined the potential consequences of any adverse development at CreditEase to the

Company's "marketing efforts" and "reputation and brand." The 2025 20-F provided, in relevant part:

> ***Any negative development in CreditEase's market position, brand recognition or financial condition may materially and adversely affect our marketing efforts and the strength of our brand*** . . . . We have benefited significantly and expect to continue to benefit significantly from our association with CreditEase in marketing our brand and our marketplace. . . . If CreditEase loses its market position, the effectiveness of our marketing efforts through our association with CreditEase may be materially and adversely affected. In addition, ***any negative publicity associated with CreditEase or any negative development in respect of CreditEase's market position, financial condition, or in terms of its compliance with legal or regulatory requirements in China, will likely have an adverse impact on the effectiveness of our marketing, as well as our reputation and brand.***

27. The statement in ¶ 26 was materially false and/or misleading at the time it was made because it presented CreditEase's distress as hypothetical and limited its consequences to the Company's marketing and brand, when CreditEase's distress directly threatened the billions of RMB its affiliates owed the Company and the

Company's relationships with Heritvest and Ruicheng, the CreditEase affiliates whose products defaulted.

28. The 2025 20-F also purported to warn that the Company's business could be disrupted if one of its key executives were "unable or unwilling" to continue in his or her position. The 2025 20-F provided, in relevant part:

> ***Our business depends on the continued efforts of our senior management. If one or more of our key executives were unable or unwilling to continue in their present positions, our business may be severely disrupted.*** Our business operations depend on the continued services of our senior management, particularly the executive officers named in this annual report. . . . If one or more of our key executives were unable or unwilling to continue in their present positions, we may not be able to replace them easily, or at all, our future growth may be constrained, our business may be severely disrupted and our financial condition and results of operations may be materially and adversely affected[.]

29. The statement in ¶ 28 was materially false and/or misleading at the time it was made because it framed the loss of key executives as a generic risk while failing to disclose that Defendant Tang, the Company's Executive Chairman and CEO, faced material legal exposure, including potential criminal liability, arising from CreditEase's conduct.

30. The 2025 20-F further disclosed that Defendant Tang held equity in the Company's VIE, Yiren Financial Information, but described the resulting risk solely as one of potential conflicts of interest. The 2025 20-F provided, in relevant part:

> ***The shareholders of the consolidated variable interest entity may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition.*** We have one consolidated variable interest entity, namely Yiren Financial Information as of the date of this annual report. The equity interests of Yiren Financial Information are held by Mr. Ning Tang, our founder and executive chairman, CreditEase Pucheng Credit Assessment and Management (Beijing) Co., Ltd., and Ms. Yan Tian. Their interests in Yiren Financial Information may differ from the interests of our company as a whole. These shareholders may breach, or cause Yiren Financial Information to breach, the existing contractual arrangements we have with them and Yiren Financial Information, as the case may be, which would have a material adverse effect on our ability to conduct the business operations of Yiren Financial Information and receive economic benefits from Yiren Financial Information.

31. The statement in ¶ 30 was materially false and/or misleading at the time it was made because it underplayed the risk posed by Yiren Financial Information's shareholders solely as a conflict of interest, when those shareholders, Defendant Tang and Pucheng Credit, were themselves directly exposed to CreditEase's financial distress and legal exposure. The Company does not own its VIE businesses; it controls them only through contracts with Defendant Tang and Pucheng Credit. As a result, the Company's hold on these businesses depended on the same individual and the same corporate group that were then exposed to CreditEase's financial distress and potential legal liability.

32. The statements in ¶¶ 24, 26, 28, and 30 were materially false and/or misleading because they misrepresented adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) CreditEase, the Company's controlling shareholder, and its affiliates, all controlled by Defendant Tang, were experiencing severe financial distress that impaired their ability to satisfy their obligations; (2) as a result, the billions of RMB owed to the Company by CreditEase affiliates were subject to significant credit risk; (3) the Company was not separate from or unaffected by the affairs of CreditEase, given their shared leadership, the Company's dependence on CreditEase, and the Company's relationships with the CreditEase affiliates whose products defaulted; (4)

Defendant Tang, the Company's Executive Chairman, CEO, and controlling shareholder, was exposed to material legal and regulatory risk, including potential criminal liability, arising from CreditEase's conduct; and (5) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

**The Truth Begins to Emerge**

33. On May 22, 2026, various media outlets reported that CreditEase was suspending all principal and interest payments on its fixed-income-like wealth management products offered through its asset management platforms, including products of Heritvest, a disclosed related party of the Company, and announced an "orderly wind-down" of those products. The suspended products were reported to be worth approximately 30 billion yuan, or about $4.4 billion.

34. On this news, the price of Yiren ADSs fell by $0.27 per ADS, or 14.44%, to close at $1.60 per ADS on May 22, 2026.

35. However, Defendants continued to conceal the truth. On May 26, 2026, four days later, the Company issued a press release entitled "Yiren Digital Comments on Recent Media Reports Concerning Affiliates of Its Controlling Shareholder," which the Company furnished to the SEC on Form 6-K on May 27, 2026 (the "May 26 Press Release"). In the May 26 Press Release, the Company reassured investors that it was independent from its controlling shareholder and that the matters reported in the media were "not connected to the Company."

36. The May 26 Press Release stated, in relevant part:

***Yiren Digital Ltd. (NYSE: YRD) ("Yiren Digital" or the "Company"), a leading fintech company specializing in digital consumer lending, insurance and financial technology innovation across China and global markets, today commented on recent media reports concerning certain financial products offered by affiliates of the Company's controlling shareholder.***

***Yiren Digital is an independent company listed on the New York Stock Exchange, with its own management team, board of directors, financial reporting and day-to-day operations that are separate from those of its controlling shareholder.*** The Company's business and strategic focus center on AI-enabled credit and insurance services and technology-driven operations. ***The Company does not operate in unrelated industries or business sectors.***

***The matters referenced in the media reports relate to affiliates of the controlling shareholder [sic] are not connected to the Company. The Company continues to operate in the normal course of business, and its operations remain unaffected.*** Transactions between Yiren Digital and its controlling shareholder and its affiliates are conducted on an arm's-length basis, and are disclosed in the Company's filings in accordance

with U.S. Securities and Exchange Commission rules and applicable regulatory requirements.

37. The statement in ¶ 36 was materially false and misleading at the time it was made because the matters referenced in the media reports were directly connected to the Company. Tang also served as the Company's Executive Chairman and CEO; the Company's CFO came from CreditEase; and the Company depended on CreditEase "for the successful operation of [its] business." The defaulted products included products of Heritvest, and CreditEase communicated with affected investors through the Ruicheng App and the Yiren Youxuan App. Heritvest and Ruicheng are among the Company's disclosed related parties and provided customer acquisition and referral services to the Company, and the Company had itself assumed CreditEase's online wealth business in 2019.

**The Truth Is Fully Revealed**

38. Defendants continued to conceal the truth until October 11, 2026, when multiple media outlets reported that CreditEase had issued a letter to investors in its fixed-income products distributed through the Ruicheng App and the Yiren Youxuan App. In that letter, CreditEase acknowledged that the May 22, 2026 suspension of redemptions constituted a substantive default and disclosed that financial due diligence advisers had preliminarily found that the group may be insolvent with a substantial repayment gap, that the underlying assets corresponding to the unredeemed products

were of poor quality, and that attempts at market-based disposal had failed to yield results.

39. Media outlet *China Daily* reported, in relevant part:

> On Sunday, CreditEase sent a targeted letter of apology to investors of fixed-income-like products via its affiliated Heritvest and Yiren Youxuan apps.
>
> The group stated that in light of the contraction of its inclusive finance and wealth management businesses and their poor returns, it decided on May 22 to suspend all payouts on fixed-income-like products.
>
> CreditEase said in the letter it intended to pursue an orderly wind-down and provide fair repayment to all investors to the extent possible. ***However, substantial losses across multiple business lines, combined with the low value of assets available for market-based disposal and the lack of effective sources of funding, resulted in an actual default on the fixed-income-like products.***
>
> ***The letter stated that a financial due diligence firm has reviewed the relevant documentation and preliminarily found that CreditEase might be insolvent, with a substantial shortfall in funds needed to meet its repayment obligations.***

> ***The underlying assets backing CreditEase's unpaid fixed-income-like products were of poor quality, and efforts to arrange a comprehensive market-based disposal of those assets had been unsuccessful.*** The legal due diligence firm stated that it was unable to independently assess the compliance of the fixed-income-like products based on the transaction channels, operating models and other relevant documentation provided by the group, CreditEase said.

40. The next day, October 12, 2026, before the market opened in New York, it was reported that the Chaoyang Branch of the Beijing Municipal Public Security Bureau had opened a criminal investigation into CreditEase and had imposed "criminal coercive measures" on several suspects, including Defendant Tang and his wife, Zhao Mei.

41. Reuters reported, in relevant part:

> ***Police in Beijing's Chaoyang district have opened a criminal investigation into Chinese wealth manager CreditEase and imposed "criminal coercive measures" on its controller and several other suspects***, Beijing police said in a statement on Monday (Oct 12). . . . The suspects include CreditEase's actual controller, a 53-year-old man surnamed Tang, and a 51-year-old woman surnamed Zhao, the statement said. It urged investors to register their cases with police and co-operate

with efforts to recover assets and minimise losses. The announcement follows CreditEase's abrupt suspension in May of redemptions on quasi-fixed-income products worth 30 billion yuan (S$5.7 billion), according to a letter sent to some of its investors on Sunday, local media outlet Yicai reported. In the letter, the company said it had commissioned a third-party firm to audit its assets and liabilities, and that ***financial due diligence advisers had preliminarily found CreditEase Group may be "insolvent, with a large debt repayment gap"***, according to the report.

42. On this news, the price of Yiren ADSs declined $0.44 per ADS, or approximately 44.1%, to close at $0.56 per ADS on October 12, 2026.

43. After the market closed on October 12, 2026, the Company issued a press release entitled "Yiren Digital Provides Update on Its CEO and Operations" (the "October 12 Press Release") which the Company furnished to the SEC on Form 6-K on October 13, 2026. Therein, the Company conceded the very risks that its SEC filings had downplayed, stating, in pertinent part:

> [T]he Company became aware of a police notice published on October 12, 2026, stating that Mr. Ning Tang, the Company's Executive Chairman and Chief Executive Officer, had been subject to criminal compulsory measures in connection with an investigation involving certain affiliates of the Company's controlling shareholder. . . . ***The investigation and the***

> ***criminal compulsory measures imposed on Mr. Ning Tang may impair or prevent him from performing his duties as the Company's Executive Chairman and Chief Executive Officer for an extended period of time. In addition, the investigation, any related legal proceedings, and any enforcement actions that may arise therefrom, although not directly related to the Company's business, could generate negative publicity and materially and adversely affect the Company's reputation, business, financial condition and results of operations.***

44. The next day, October 13, 2026, the Company issued a press release entitled "Yiren Digital Appoints Na Mei as Acting Chief Executive Officer" (the "October 13 Press Release") which the Company furnished to the SEC on Form 6-K that same day. Therein, the Company stated, in pertinent part:

> [T]he Company's board of directors (the "Board") has appointed Ms. Na Mei as Acting Chief Executive Officer, effective October 13, 2026. ***The appointment follows the Company's announcement on October 12, 2026 regarding its Chief Executive Officer and is intended to support continuity in the Company's management and operations. Ms. Mei will oversee the Company's day-to-day operations and work with the existing management team under the oversight of the Board.***

45. Following the October 12 Press Release and October 13 Press Release, the price of Yiren ADSs continued to decline, falling an additional $0.1050, or approximately 18.7%, to close at $0.46 per ADS on October 13, 2026.

46. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADSs, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

47. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of the Company during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

48. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record

owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements

made, in light of the circumstances under which they were made, not misleading;

- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

53. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- the Company's securities are traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

54. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

55. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants

omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

56. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59. The Company and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

60. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

61. During the Class Period, Defendants acted with scienter in that they knew or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Yiren were materially false and misleading at the time they

were made. Specifically, the facts set forth below, considered collectively and together with the facts alleged elsewhere in this Complaint, give rise to a strong inference of scienter:

- The Company's exposure to CreditEase was central to its business and financial condition, such that knowledge of it may be imputed to Defendants. The Company admitted that it relied on CreditEase "for the successful operation of [its] business."
- The temporal proximity between Defendants' statements and the revelation of the truth further supports a strong inference of scienter. CreditEase suspended all principal and interest payments on its fixed-income-like wealth management products on May 22, 2026, just 23 days after the Company filed the 2025 20-F representing that there was no significant credit risk associated with the amounts owed by CreditEase affiliates. Distress of that scale does not arise in three weeks.
- On June 1, 2026, ten days after CreditEase suspended payments, the Company replaced its independent registered public accounting firm, Wei, Wei & Co., LLP, with Marcum Asia CPAs LLP. The timing of this change, in the midst of a crisis at the Company's controlling shareholder and principal related-party debtor, is further indicative of scienter.

- The Company's own statements at the end of the Class Period confirm that the risks Defendants downplayed were concrete and known. In the October 12 Press Release, the Company conceded that the criminal measures imposed on Tang "may impair or prevent him from performing his duties as the Company's Executive Chairman and Chief Executive Officer for an extended period of time" and "could . . . materially and adversely affect the Company's reputation, business, financial condition and results of operations."
- The next day, the Board appointed an Acting CEO to replace Tang once the criminal measures had been imposed on him by Beijing Police.

62. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

63. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members

of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

64. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

65. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

66. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act Against The Individual Defendants

67. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

69. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

70. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In

this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

71. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

72. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Date: October 29, 2026

Respectfully submitted,

/s/ Laurence M. Rosen, Esq.

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*